Filed 3/6/14  In re Manuel B. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re MANUEL B., a Person Coming Under the Juvenile Court Law. _____ | B249295 |
| THE PEOPLE, Plaintiff and Respondent, v. MANUEL B., Defendant and Appellant. | (Los Angeles County Super. Ct. No. GJ29988) |

APPEAL from an order of the Superior Court of Los Angeles County, Robin Miller Sloan, Judge.  Affirmed.

Bruce G. Finebaum, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

——————————————

Defendant and appellant, Manuel B., appeals from the order of wardship (Welf. & Inst. Code, § 602) entered as a result of the juvenile court's finding he committed the felony of first degree residential burglary (Pen. Code, § 459), and his admissions he committed the misdemeanors of possession of nitrous oxide (Pen. Code, § 381b) and battery, during which he inflicted great bodily injury (Pen. Code, § 243, subd. (d)).  The juvenile court ordered Manuel B. removed from the custody of his parents and committed to the care and custody of the probation department for suitable placement.  After awarding Manuel B. predisposition custody credit for 56 days served in juvenile hall, the juvenile court indicated his maximum period of confinement was not to exceed six years six months.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

   a. *The residential burglary.*[1]

At approximately 10:00 a.m. on July 17, 2012, Pamela Thomas and her granddaughter left Thomas's home located on Chester Avenue in Pasadena.  Thomas's house has five doors on the first level which lead to the outside.  There is no gate to enter the backyard of the house.  There is just an "open driveway."

Thomas and her granddaughter returned to Thomas's Pasadena home at approximately 2:00 p.m. that afternoon.  After Thomas entered her house through the front door, she noticed a closet door, which had been closed before she left the house, was "wide open."  When Thomas then went into her kitchen, she saw that one of the French doors leading to an outside patio was open and leaning against the house.  The door had been taken off its hinges and was "leaning in the opening."  Thomas had locked the door, and each of the other doors leading to the outside, before she had left that morning.  When she arrived home, she did not touch or attempt to move the French doors.

---

[1]     The facts have been taken from the transcript of the hearing held on May 2, 2013.

In the meantime, Thomas's granddaughter had gone down a hallway to the room where she had been staying and "yelled out that her duffel bag was missing." Her clothes had been removed from the bag and the bag had been taken. Thomas grabbed her telephone, then went into the room she used as an office. Her computer, which had been "completely set up," was "tipped upside down on the couch and the keyboard was missing." Thomas called 911, then checked her bedroom. There, she found some jewelry on the floor. In her bathroom, a jewelry box and drawer where she kept jewelry had been "tipped upside down and everything [was] gone."

After speaking with police, Thomas went through her house to determine what was missing. In addition to her granddaughter's duffel bag, the computer key board and multiple pieces of jewelry, Thomas noted a camera and a BB gun were gone.

When asked if, at any time, she had met Manuel B. or allowed him to use her computer, Thomas indicated she had not. Thomas was then shown a series of nine photographs depicting "[t]he areas of [her] home that had been tampered with." Among the photographs was one of the bathroom which had been used by Thomas's granddaughter. A set of rings and a necklace Thomas had given to her granddaughter the day before were no longer on the counter where her granddaughter had left them.

When police officers arrived at Thomas's residence, they, without touching or moving the French doors in the kitchen, photographed them and dusted them for fingerprints. After determining Thomas had not touched or moved anything since she had arrived at her home that afternoon, officers also dusted other areas of the house for fingerprints.

During the afternoon hours of July 17, 2012, Pasadena Police Department forensic specialist Allen Brogdon was directed to report to Thomas's residence at 915 North Chester Avenue. Once he arrived at the house, Brogdon took photographs of "areas [of the house where] suspect activity . . . [and] ransacking take[] place in burglaries. [He] [t]hen process[ed] for fingerprints left by the suspects or anybody else involved in the case." These included "[t]he area of entry, which was the southwest living room[, as well as] the interior of the location [including the] bathroom and the office." Brogdon found a

3

print in the office on the computer monitor, "which [he] used fingerprint powder and a brush to develop." In order to remove the print from the monitor, Brogdon had to pick it up from the couch so the screen was facing up. He then lifted the print from the screen with "adhesive tape" and placed it on a card. After filling out the card, Brogdon submitted it to the department's "latent section." Brogdon was not able to collect any latent prints from the French doors through which the intruder had entered the house, the bathroom counter, surfaces in the bedrooms or other "areas [he] believe[d]" the burglar had gone.

Pasadena Police Department forensics specialist and latent print examiner Danielle Biglin had completed over one hundred thousand latent print comparisons. On August 1, 2012, Biglin had compared the latent print lifted by Brogdon to a "10 print exemplar card" which Brogdon had retrieved from a Los Angeles County data base. After comparing the latent print to those from the data base, Biglin concluded the latent print and the print of the left thumb on the exemplar had been made by the same person. Biglin conducted "a thorough examination [and determined] all of the details in both the latent print and the exemplar print matched without any dissimilarities." Biglin then compared prints she had taken from Manuel B. to both the 10 print exemplar card and the latent print lifted by Brogdon. After making the comparison, Biglin determined all the prints had been made by the same person.

On August 24, 2012, Pasadena Police Detective Alex Torres was assigned to the burglary task force. On that date, the detective arrested Manuel B. When Torres asked Manuel B. where he lived, Manuel B. told the detective he resided on the "six hundred block of Buckeye," approximately one mile from Thomas's home on Chester Avenue. Torres arrested Manuel B. at Pasadena High School. The detective indicated, if one is traveling from Manuel B.'s home to the high school, one must "pass the victim's address" on Chester Avenue.

4

b. *Possession of metal knuckles.*[2]

On October 26, 2012, Pasadena Police Officers were on patrol when they observed Manuel B. and three companions off of school grounds during school hours. Manuel B. informed one of the officers he had in his possession metal knuckles.

c. *Possession of Nitrous Oxide.*

At approximately 7:15 p.m. on November 1, 2012, Pasadena Police Officers responded to a call reporting the sale of balloons filled with nitrous oxide. When officers arrived at the scene, they observed Manuel B. reaching into a Suburban, by the rear seat. Manuel B.'s companion was holding two balloons filled with nitrous oxide. A gas tank with a label on it indicating it contained nitrous oxide was found inside the Suburban.

When he was questioned about the nitrous oxide, Manuel B. told officers he "was just hitting that shit" and he and his companion were "giving away the balloons." Manuel B.'s father then arrived and informed police officers he had not given Manuel B. permission to take his Suburban.

d. *Hit and run driving.*

On February 2, 2013, Manuel B.'s mother asked him to move her car out of the driveway and to park it. Instead, Manuel B. drove the car away. As Manuel B. was driving, he saw the driver of another car make a wide turn. The driver had to put his car in reverse in order to complete the turn and, when he did so, the two cars collided. Manuel B. then "fled the scene."

e. *Battery with serious bodily injury.*

According to an officer at the Pasadena Police Department, on March 18, 2013, Manuel B. approached a 14-year-old male victim because the victim was " 'talking shit.' " Without any further provocation, Manuel B. "punched the victim in the face three times. When the victim [then] fell to the ground, [Manuel B.] punched him in the face another six to seven times. The victim suffered a bloody nose, two black eyes, and a

---

[2]    The facts regarding Manuel B.'s possession of metal knuckles, possession of nitrous oxide, hit and run driving and battery, during which he caused serious bodily injury, have been taken from probation reports.

nasal fracture." Manuel B. stopped punching the victim when a car drove by and the driver honked his horn. At that point, Manuel B. got on his bicycle and rode away.

After the victim identified Manuel B. as the individual who had assaulted him on March 22, 2013, Pasadena Police Officers went to Manuel B.'s home and took him into custody.

2. *Procedural history.*

On October 23, 2012, a petition was filed alleging the 15-year-old minor, Manuel B., came within the provisions of Welfare and Institutions Code section 602 by reason of his having committed, on or about July 17, 2012, the felony of first degree burglary in violation of Penal Code section 459. After Manuel B. denied the allegation and was referred to the probation department for a pre-plea report, he was released to the custody of his parents. The juvenile court then continued the matter to December 4, 2012.

On December 24, 2012, a petition was filed pursuant to Welfare and Institutions Code section 602 in which it was alleged Manuel B. committed the felony of possession of metal knuckles in violation of Penal Code section 21810 on October 26, 2012. Although he was originally detained, he was later released to the custody of his parents and allowed to remain at home.

In a petition filed pursuant to Welfare and Institutions Code section 602 on February 7, 2013, it was alleged that on November 1, 2012, Manuel B. possessed nitrous oxide in violation of Penal Code section 381b, a misdemeanor. After Manuel B. denied the allegation, he was released to the custody of his mother. He was also, however, ordered by the juvenile court to be placed in the Community Detention Program. Pending the next hearing, scheduled for April 12, 2013, Manuel B. was to comply with certain conditions, including that he not leave his home except to attend "church [and] school only." In addition, he was to be detained upon his first violation.

A petition filed pursuant to Welfare and Institutions Code section 602 on March 7, 2013 alleged that on February 2, 2013, 16-year-old Manuel B. committed the misdemeanor of hit and run driving in violation of Vehicle Code section 20002, subdivision (a) and the misdemeanor of driving without a license in violation of Vehicle

6

Code section 12500, subdivision (a). Although Manuel B. was initially taken into custody, he was later released to his parents and allowed to go home.

On March 26, 2013, a petition was filed pursuant to Welfare and Institutions Code section 602 which alleged Manuel B. committed the misdemeanor of battery during the commission of which he inflicted serious bodily injury in violation of Penal Code section 243, subdivision (d). As a result of the filing of the petition, Manuel B. was taken into custody by the Pasadena Police Department and detained in juvenile hall. Further, it was determined he was ineligible for probation pursuant to Penal Code section 1203.06.

At a hearing held on May 2, 2013, evidence was presented regarding the charge Manuel B. had committed first degree burglary on July 17, 2012. After the prosecution presented its case, defense counsel made a motion to dismiss the matter "for insufficiency of the evidence" pursuant to Welfare and Institutions Code section 701.1. The trial court denied the motion and, after counsel presented their arguments, the juvenile court found the allegation of the felony of residential burglary to be true and sustained the petition filed October 23, 2012. Disposition of the matter and hearings with regard to Manuel B.'s remaining petitions were then set for May 2013.

At proceedings held on May 8, 2013, the juvenile court informed Manuel B. it was proceeding on two petitions pending before the court: one filed on March 26, 2013, charging Manuel B. with battery during which he inflicted great bodily injury and one filed on February 7, 2013, charging Manuel B. with possession of nitrous oxide. After discussing the matter with his counsel, Manuel B. decided to admit the two offenses.

The juvenile court advised Manuel B. he had the "right to an adjudication" of the charges, he had the right to be represented by an attorney, he had the right to "confront and cross-examine the witnesses called against [him]," the right to "present a defense and to testify as part of that defense," and "the right to remain silent," also known as the "right against self-incrimination." Manuel B. then indicated he understood and was willing to "agree to waive and give up each of [those] rights." After the juvenile court then advised Manuel B. of the consequences of his admissions, including the effect they would have on any matter on which he was on probation, his citizenship status and

7

various fees and restitution fines, Manuel B. indicated he understood the consequences then admitted having committed the misdemeanor of possession of nitrous oxide in violation of Penal Code section 381b and the misdemeanor of battery, during which he inflicted great bodily injury, in violation of Penal Code section 243, subdivision (d). After both the prosecutor and Manuel B.'s counsel joined in the waivers and admissions and stipulated that each of the admissions was supported by a factual basis, the juvenile court accepted Manuel B.'s admissions, then continued the matter to May 16, 2013, for disposition of the petitions.

At the hearing held on May 16, counsel for Manuel B. argued that, although a number of petitions had been filed against him, they were for the most part for misdemeanors and the court had indicated it intended to dismiss two of them, the one alleging possession of brass knuckles and the one alleging hit and run driving and driving without a license. In addition, counsel indicated Manuel B. had been in custody at juvenile hall for the previous 56 days and "that ha[d] brought [a] message home to him regarding [his] misconduct." Counsel argued that "home on probation" would be the "appropriate" resolution of Manuel B.'s cases. The prosecutor asserted the petitions which had been filed showed "a clear pattern that [Manuel B. was] out of control and steering down the wrong path." The prosecutor also noted that, before the present petitions had been filed, Manuel B. had been arrested for "petty theft, tobacco [and] receiving stolen property." The prosecutor continued, "And then his latest 2 petitions were acts that put others into danger. The hit and run driving, and then of course the battery with serious bodily injury. [¶] . . . He needs the utmost structure right now. And in the probation report his dad mentions that he no longer has any control over him." In addition, the prosecutor indicated he believed placement in camp would assist Manuel B. with "his marijuana . . . [and] anger issues" as well as enable him to continue his education.

After counsel completed their arguments, the juvenile court declared Manuel B. a ward of the court pursuant to section 602 of the Welfare and Institutions Code, removed Manuel B. from the physical custody of his parents and placed him under the care,

8

custody, control and supervision of the probation department. The juvenile court dismissed the petitions filed with regard to "the brass knuckles and [the] hit and run," awarded Manuel B. predisposition credit for 56 days served in juvenile hall and indicated he faced a maximum period of confinement of six years and six months. After informing Manuel B. of the terms of his placement, the juvenile court indicated he would be sent to a group home.

Manuel B. filed a timely notice of appeal from the juvenile court's order on June 6, 2013.

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record. By notice filed December 3, 2013, the clerk of this court sent to the address at which Manuel B. was presumed to be residing a letter advising him to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. The letter was returned to this court on December 30, 2013, as "unable to forward." It has been determined that neither the United States Postal Service nor Manuel B.'s counsel has his current mailing address. As of this date, Manuel B. has failed to contact this court.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

9

## DISPOSITION

The order of wardship is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**




KLEIN, P. J.

We concur:




CROSKEY, J.




KITCHING, J.